UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| STATE OF HAWAI'I, EX REL. ANNE E. LOPEZ, ATTORNEY GENERAL;<br><br>          Plaintiff,<br><br>     vs.<br><br>CAREMARKPCS HEALTH, L.L.C., EXPRESS SCRIPTS, INC., and OPTUMRX, INC.,<br><br>          Defendants. | CIV. NO. 23-00464 LEK-RT |

**ORDER DENYING PLAINTIFF'S MOTION TO REMAND**

On November 29, 2023, Plaintiff State of Hawai`i, by and through Anne E. Lopez, Attorney General ("the State"), filed its Motion to Remand ("Motion"). [Dkt. no. 29.] On February 2, 2024, Defendant Express Scripts, Inc. ("Express Scripts") and Defendant Caremark Health, LLC ("Caremark") filed their respective memoranda in opposition ("Express Scripts Opposition" and "Caremark Opposition"). [Dkt. nos. 72, 73.] Also on February 2, 2023, Defendant OptumRx, Inc. ("OptumRx") filed a statement noting its opposition to the Motion. [Dkt. no. 74.] The State filed its reply addressing the Express Scripts Opposition and the Caremark Opposition on February 9, 2024. [Dkt. no. 75.] This matter came on for hearing on February 23, 2024. The State's Motion is hereby denied for the reasons set forth below.

**BACKGROUND**

The State filed its original Complaint in the State of Hawai`i Circuit Court of the First Circuit ("state court") on October 4, 2023, and the State served the Complaint on Express Scripts on October 19, 2023. See Notice of Removal of Civil Action Under 28 U.S.C. §§ 1442(a)(1) and 1446, filed 11/17/23 (dkt. no. 1) ("Notice of Removal"), at ¶ 1; see also id., Declaration of C. Michael Heihre ("Heihre Removal Decl."), Exh. E (copies of filings in the state court) at PageID.730-74 (Complaint). The State filed its First Amended Complaint on November 6, 2023 ("Amended Complaint"), and the State served the Amended Complaint on Express Scripts on November 8, 2023. See Notice of Removal at ¶ 2; see also Heihre Removal Decl., Exh. A (Amended Complaint). Express Scripts removed the action based on the federal officer removal statute, Title 28 United States Code Section 1442(a)(1). See Notice of Removal at ¶¶ 16-18. Caremark filed a Supplemental Notice of Removal on November 17, 2023. [Dkt. no. 8.] Caremark also invoked federal officer removal. [Id. at ¶ 4.] Caremark and Express Scripts will be referred to collectively as "the Removing Defendants," and Caremark, Express Scripts and OptumRx will be referred to collectively as "Defendants."

I.    __Allegations of the Amended Complaint__

The State alleges that, "[f]rom 2014 to 2020, prescription drug prices increased by 33%, outpacing inflation and price increases for any other medical commodity or service," and making 'life-saving medications unaffordable for many Americans – particularly seniors." [Amended Complaint at ¶¶ 34-35.] "In 2020, it was estimated that high out-of-pocket costs for drugs would cause 1.1 million premature deaths of seniors in the Medicare program over the next decade, and lead to an additional $177.4 billion in avoidable Medicare medical costs." [Id. at ¶ 37.]

The State cites insulin as an example and alleges:

> In 1999, Humalog (insulin) was affordably priced at $21. Twenty years later, the price had increased by more than 1000% to $332. Due to unprecedented pressure on [pharmacy benefit managers ("PBMs")] and insulin manufacturers, insulin costs are finally starting to decrease. For example, on April 3, 2019, Express Scripts announced the launch of its Patient Assurance Program, which Express Scripts claims will "ensure eligible people with diabetes in participating plans pay no more than $25 for a 30-day supply of insulin." Unfortunately, PBMs have not provided this same type of broad relief for the high cost of drugs other than insulin. Further, PBMs have not provided restitution for the prior years' worth of overpayments and their promise to offer insulin at reduced prices is not indefinite.

[Id. at ¶ 38 (footnotes omitted).]

The State alleges that, although PBMs are administrators hired by third-party payors for the benefit of consumers, PBMs have developed a business model that maximizes PBM profits through inflated prices for brand-name prescription drugs. [Id. at ¶¶ 5-7.] PBMs "create[] drug formularies — a list of prescription drugs covered by health plans tiered according to consumers' cost-share obligations (e.g., tier 1 drugs require a $5 co-payment, tier 2 drugs require a $10 co-payment)." [Id. at ¶ 5.] Drug manufacturers pay rebates and fees to PBMs to obtain preferred placement on the drug formularies. The prices that consumers or insurers are charged include the rebates and fees, but consumers are not aware of this. [Id. at ¶¶ 8-10.] According to the State, PBMs typically retain a portion of the rebates. [Id. at ¶ 14.] PBMs will "exclude one or more drugs used to treat the same condition from a PBM formulary to intensify competition among manufacturers." [Id. at ¶ 15.] Drug manufacturers typically increase a drug's wholesale acquisition cost ("WAC"), also known as the "list price" or "sticker price," so that the rebate does not decrease the manufacturer's target revenue. [Id. at ¶ 16.] The State alleges that,

> since 2014, there has been a fundamental shift in payments from prescription drug manufacturers to PBMs. Manufacturer payments to PBMs and other intermediaries have risen by over 16% per annum and now constitute 40% or more of brand-name prescription drug costs. In 2013, the manufacturer Sanofi offered rebates for insulin

4

> products between 2% and 4% for preferred
> placement on CVS Caremark's formulary. By
> contrast, in 2018, Sanofi's rebates for insulin
> products were as high as 56% for preferred
> formulary placement.

[Id. at ¶ 17 (footnotes omitted).]

The State contends the PBM practice of using rebates and fees to manipulate the price of prescription drugs harms consumers by: 1) increasing consumers' out-of-pocket payments, which are tied to a drug's WAC; 2) increasing the likelihood that consumers will change medications "for reasons other than a drug's efficacy, side effects, or clinical outcome," which can be particularly harmful because some drugs are more effective for some patients than other drugs made to treat the same condition; and 3) increasing drug prices for the market in general, including persons who are not served by a PBM, such as uninsured patients. [Id. at ¶ 20.]

"Defendants collectively manage 80% of prescription drug benefits for more than 220 million Americans. As such, placement on their formularies is a significant bargaining chip when negotiating drug rebates." [Id. at ¶ 14.] Defendants are all registered to do business in Hawai`i and provide PBM services in Hawai`i. See id. at ¶¶ 23, 26, 29. The State investigated PBM involvement, but Caremark and OptumRx only produced data regarding insulin products. Express Scripts produced data regarding insulin products and one other product.

The State therefore used insulin as a case study in its investigation, [id. at ¶ 18,] but this action is not limited to insulin and other diabetes medication, [id. at ¶ 22].

The State brings this action pursuant to Hawai`i Revised Statutes Section 480-2 to prevent unfair or deceptive acts or practices ("UDAP") and unfair methods of competition in trade or commerce ("UMOC"). [Id. at ¶ 21.] The State expressly represents that it "is not seeking relief relating to any federal program (e.g., Medicaid, Medicare, TRICARE, FEHBA) or any contract related to a federal program," but is instead attempting to address "the larger unfair and deceptive scheme that violates HRS § 480-2 and increased prices and reduced access to brand-name prescription drugs for Hawai`i consumers." [Id. at ¶ 22.]

The State brings the following claims: a deceptive acts and practices claim under Section 480-2 ("Count I"); an unfair acts and practices claim under Section 480-2 ("Count II"); a UMOC claim under Section 480-2 ("Count III"); and a claim for treble damages pursuant to Section 480-2 and Hawai`i Revised Statutes Section 480-14 ("Count IV").

The State seeks the following relief: a declaratory judgment as to each count; an injunction prohibiting Defendants from engaging in further UDAPs; a restitution award, pursuant to Hawai`i Revised Statutes Section 661-10, for all Hawai`i

6

consumers who were affected by Defendants' unlawful acts and
practices; disgorgement of Defendants' ill-gotten gains; treble
damages, pursuant to Section 480-14; civil penalties pursuant to
Hawai`i Revised Statutes Section 480-3.1 and pursuant to Hawai`i
Revised Statutes Section 480-13.5 for violations committed
against elders; attorney's fees and costs; post-judgment
interest; and any other appropriate relief.

## II.  **Basis for Removal and the Instant Motion**

As previously noted, Express Scripts removed the
action based on the federal officer removal statute, Title 28
United States Code Section 1442(a)(1). See Notice of Removal at
¶ 16. As to any claims additional claims that would not be
covered by federal-officer removal, Express Scripts asserts
supplemental jurisdiction would apply. [Id. at ¶ 62 (citing 28
U.S.C. § 1367(a)).]

Express Scripts states it currently has a contract
with the United States Department of Defense ("DoD") to provide
PBM services to members of the TRICARE health care program
("TRICARE Contract"). TRICARE members include active-duty
service members, their families, and retired service members.
TRICARE has members in Hawai`i. [Id. at ¶¶ 3-4; Heihre Removal
Decl., Exh. B (redacted version of the TRICARE Contract).]
Express Scripts, through its subcontractors, administers mail-

order pharmacy services under the TRICARE Contract. [Notice of Removal at ¶ 5.]

Express Scripts contest the merits of the State's allegations and claims. [Id. at ¶¶ 5-6.] But, Express Scripts argues that, "[r]egardless of the merits of its claims, the State's allegations implicate Express Scripts' contractual obligations under the TRICARE contract" because some of the Hawai`i citizens that the State purports to protect in this action are TRICARE beneficiaries, and some of the Hawai`i TRICARE beneficiaries utilize the mail-order pharmacy services. [Id. at ¶ 7.] Express Scripts asserts that "[t]he formulary used for TRICARE beneficiaries, the prices the federal government pays for the prescription drugs, and the copayments Express Scripts must ensure beneficiaries pay, are all dictated by federal law and the TRICARE Contract." [Id.] Because the State alleges Defendants' practices lead to artificially inflated prices that increase consumers' out-of-pocket costs, and because the State seeks to recover the alleged overpayments, Express Scripts argues the State is seeking to recover copayments that were determined by the federal government under the TRICARE Contract. [Id. at ¶¶ 8-10.]

The arguments presented in Caremark's Supplemental Notice of Removal are similar to the arguments raised by Express Scripts. In addition, Caremark notes that federal regulations

authorize PBMs to negotiate rebates on behalf of Federal Employees Health Benefits Act ("FEHBA") carriers, and the contracts that the PBMs have with FEHBA carriers usually require that rebates be passed on to the carrier. Caremark negotiates rebates with drug manufacturers on behalf of FEHBA carrier clients as well as other clients, and no rebate is exclusive to FEHBA plans. Thus, to the extent that the State challenges Caremark's rebate negotiations, the State necessarily challenges conduct that Caremark engages in while acting under a federal officer. [Suppl. Notice of Removal at ¶¶ 3-4.] Caremark argues the State "challenge[s] core services that Caremark offers to provide to all of its clients and for all pharmaceutical products, including those governed by FEHBA contracts," and, if the State were to obtain the relief sought in this case, it would impair or completely preclude Caremark's delivery of those core services to its clients, including FEHBA carriers. [Id. at ¶ 18.]

The crux of the State's Motion is that paragraph 22 of the Amended Complaint is an express disclaimer of any relief as to federal programs, and therefore the disclaimer is sufficient to avoid federal officer removal jurisdiction.

## **STANDARD**

Title 28 United States Code Section 1442(a) states, in pertinent part:

9

> A civil action . . . that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> > (1)  The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

The Ninth Circuit has stated:

> The purpose of the federal officer removal statute is "to ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his duties." Arizona v. Manypenny, 451 U.S. 232, 241, 101 S. Ct. 1657, 68 L. Ed. 2d 58 (1981). The right of removal is "absolute for conduct performed under color of federal office," and the "policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'" Id. at 242, 101 S. Ct. 1657 (quoting Willingham v. Morgan, 395 U.S. 402, 407, 89 S. Ct. 1813, 23 L. Ed. 2d 396 (1969)).
>
> An entity seeking removal under § 1442(a)(1) bears the burden of showing "that (a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1251 (9th Cir. 2006) (quoting Jefferson Cty. v. Acker, 527 U.S. 423, 431, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999)).

<u>Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego</u>,
865 F.3d 1237, 1244 (9th Cir. 2017). In performing this
analysis, courts have a "duty to interpret Section 1442 broadly
in favor of removal." <u>Id.</u> (citation and internal quotation marks
omitted).

> Removal rights under § 1442 thus "are much
> broader than those under section 1441." <u>Durham</u>,
> 445 F.3d at 1253. For example, "suits against
> federal officers may be removed despite the
> nonfederal cast of the complaint; the federal-
> question element is met if the defense depends on
> federal law." <u>Jefferson County v. Acker</u>, 527 U.S.
> 423, 431, 119 S. Ct. 2069, 144 L. Ed. 2d 408
> (1999). And unlike garden-variety remand orders
> for lack of subject-matter jurisdiction or
> defects in removal procedure, which are not
> appealable, <u>see</u> <u>Kircher v. Putnam Funds Tr.</u>, 547
> U.S. 633, 640–41, 126 S. Ct. 2145, 165 L. Ed. 2d
> 92 (2006) (discussing 28 U.S.C. § 1447(d)'s
> general preclusion of appellate review of remand
> orders), when (as here) removal relies on § 1442,
> a remand order for lack of subject-matter
> jurisdiction **is** appealable. <u>See</u> 28 U.S.C.
> § 1447(d).

<u>DeFiore v. SOC LLC</u>, 85 F.4th 546, 554 (9th Cir. 2023) (emphasis
in original). In addition, when a defendant removes an action
based on the federal officer removal statute, the consent of the
other defendants is not required. <u>Marcher v. Air & Liquid Sys.
Corp.</u>, Case No. 2:22-cv-00059-RGK-MRW, 2022 WL 562268, at *1 n.1
(C.D. Cal. Feb. 24, 2022) (citing 28 U.S.C. § 1442(a)).

## DISCUSSION

### I.   Whether Each Removing Defendant Is a "Person"

Each of the Removing Defendants is a "person" for
purposes of Section 1442(a)(1).

> The courts of appeals have uniformly held that
> corporations are "person[s]" under § 1442(a)(1).
> See In re Commonwealth's Motion to Appoint
> Counsel Against or Directed to Def. Ass'n of
> Phila., 790 F.3d 457, 467-68 (3d Cir. 2015)
> (holding that § 1442(a)(1)'s use of the term
> "person" includes corporations); Bennett v. MIS
> Corp., 607 F.3d 1076, 1085 (6th Cir. 2010)
> (same); Isaacson v. Dow Chem. Co., 517 F.3d 129,
> 135-36 (2d Cir. 2008) (same). We agree . . . .
> See 1 U.S.C. § 1 (defining "person" to include,
> unless the context indicates otherwise,
> "corporations, companies, associations, firms,
> partnerships, societies, and joint stock
> companies, as well as individuals"); see also
> Watson v. Phillip Morris Cos., 551 U.S. 142, 152-
> 54, 157, 127 S. Ct. 2301, 168 L. Ed. 2d 42 (2007)
> (using the term "private person" and "company"
> interchangeably in the context of § 1442(a)(1),
> but holding that the defendant-company could not
> remove the action); Leite v. Crane Co., 749 F.3d
> 1117, 1122 n.4, 1124 (9th Cir. 2014) (citing
> Watson, 551 U.S. at 152-53, 127 S. Ct. 2301; and
> Isaacson, 517 F.3d at 135-36); Jacks v. Meridian
> Res. Co., LLC, 701 F.3d 1224, 1230 n.3 (8th Cir.
> 2012) (citing Watson, 551 U.S. at 152-53, 127 S.
> Ct. 2301).

Goncalves, 865 F.3d at 1244 (some alterations in Goncalves).

Thus, the first federal officer removal requirement is satisfied

as to both Express Scripts and Caremark.

### II.  Causal Nexus

The second requirement - causal nexus - can be

established through a showing that: 1) the party's actions at

issue in the case were "'actions under' a federal officer"; and 2) there was a causal connection between those actions and the plaintiff's claims. <u>Id.</u> (citing <u>Durham</u>, 445 F.3d at 1251).

> [T]he "hurdle erected by [the causal-connection] requirement is quite low." <u>Isaacson</u>, 517 F.3d at 137; <u>see also</u> <u>Maryland v. Soper</u>, 270 U.S. 9, 33, 46 S. Ct. 185, 70 L. Ed. 449 (1926) ("[T]he statute does not require that the prosecution must be for the very acts which the officer admits to have been done by him under federal authority. It is enough that his acts or his presence at the place in performance of his official duty constitute the basis, though mistaken or false, of the state prosecution."). The [defendants] need show only that the challenged acts "occurred because of what they were asked to do by the Government." <u>Isaacson</u>, 517 F.3d at 137. . . .
>
> . . . Although the federal officer removal statute is not limitless, "[t]he words 'acting under' are broad," and the Supreme Court "has made clear that the statute must be 'liberally construed.'" <u>Watson</u>, 551 U.S. at 147, 127 S. Ct. 2301 (quoting <u>Colorado v. Symes</u>, 286 U.S. 510, 517, 52 S. Ct. 635, 76 L. Ed. 1253 (1932)). For a private entity to be "acting under" a federal officer, the private entity must be involved in "an effort to assist, or to help carry out, the duties or tasks of the federal superior." <u>Id.</u> at 152, 127 S. Ct. 2301. The "relationship typically involves 'subjection, guidance, or control,'" but it must go beyond simply complying with the law, even if the laws are "highly detailed" and thus leave the entity "highly regulated." <u>Id.</u> at 151–53, 127 S. Ct. 2301 (citation omitted). Thus, "[t]he assistance that private contractors provide federal officers [must go] beyond simple compliance with the law and help[] officers fulfill other basic governmental tasks." <u>Id.</u> at 153, 127 S. Ct. 2301.

<u>Id.</u> at 1244–45 (some alterations in <u>Goncalves</u>).

13

The required causal nexus can also be established by
showing that the defendant's actions were connected to or
associated with acts under color of a federal office. DeFiore,
85 F.4th at 557 n.6. In DeFiore, the Ninth Circuit stated:

> We note that in 2011 Congress amended
> § 1442(a)(1) to allow removal by federal officers
> (and persons acting under them) of suits "for or
> relating to any act under color of such
> office . . . ." 28 U.S.C. § 1442(a)(1); see
> Removal Clarification Act of 2011, Pub. L.
> No. 112-51, § 2(b)(1)(A), 125 Stat. 545.
> Previously, the statute allowed for removal of
> suits "for any act under color of such office."
> By so amending the statute, "Congress broadened
> federal officer removal to actions, not just
> **causally** connected, but alternatively **connected**
> or **associated**, with acts under color of federal
> office." Latiolais v. Huntington Ingalls, Inc.,
> 951 F.3d 286, 292 (5th Cir. 2020) (en banc)
> (emphasis in original); cf. Morales v. Trans
> World Airlines, Inc., 504 U.S. 374, 383, 112 S.
> Ct. 2031, 119 L. Ed. 2d 157 (1992) (stating that
> the "ordinary meaning" of "relating to" "is a
> broad one — 'to stand in some relation; to have
> bearing or concern; to pertain; refer; to bring
> into association with or connection with'")
> (quoting *Black's Law Dictionary* 1158 (5th ed.
> 1979)). We read our "causal nexus" test as
> incorporating the "connected or associated with"
> standard reflected in Congress's 2011 amendment
> and the Supreme Court's decisions. See Goncalves,
> 865 F.3d at 1244-45.

Id. (emphases in DeFiore).

## A.   **Actions Under a Federal Officer**

### 1.   **Caremark**

In the instant case, Caremark argues it "helps [the
U.S. Office of Personnel Management ('OPM')] carry out its

14

statutory mandate to provide health benefits to federal

employees by providing PBM services and thus acts under a

federal officer when acting on behalf of its FEHBA clients."

[Caremark Opp. at 12 (citations omitted).]

> Congress "establishe[d] a comprehensive program
> of health insurance for federal employees."
> Empire Healthchoice Assurance, Inc. v. McVeigh,
> 547 U.S. 677, 682, 126 S. Ct. 2121, 165 L. Ed. 2d
> 131 (2006). Congress envisioned the creation of a
> system whereby "OPM is 'responsible for the
> overall administration of the program while
> sharing the day-to-day operating responsibility
> with the employing agencies and the insurance
> carriers.'" Houston Cmty. Hosp. v. Blue Cross &
> Blue Shield of Tex., Inc., 481 F.3d 265, 271 (5th
> Cir. 2007) (quoting H.R. Rep. No. 86-957, at 2
> (1959)). FEHBA "authorized [OPM] to contract with
> private carriers for federal employees' health
> insurance" and gave OPM "broad administrative and
> rulemaking authority over the program." Coventry
> Health Care of Mo., Inc. v. Nevils, --- U.S. ----
> 137 S. Ct. 1190, 1194-95, 197 L. Ed. 2d 572
> (2017) (citing 5 U.S.C. §§ 8901-13).

Goncalves, 865 F.3d at 1245-46 (alterations in Goncalves). OPM

contemplates that the FEHB carriers will utilize PBMs. See,

e.g., U.S. Office of Personnel Management Healthcare and

Insurance, FEHB Program Carrier Letter – All FEHB and PSHB

Carriers (PSHB: Except for Medicare Part D portion), Letter

Number 2024-05, Subject: Consolidated Pharmacy Benefits Guidance

for the FEHB Program (Feb. 12, 2024) at § XII ("Standards for

PBM arrangements are set out in the FEHB contracts."); U.S.

Office of Personnel Management Healthcare and Insurance, FEHB

Program Carrier Letter – Experience-Rated HMO and Fee-For-

Service Carrier, Letter Number 2024-02, Subject: Pharmacy Benefits Management (PBM) Transparency Standards (Jan. 25, 2024) at pg. 1 ("OPM has included PBM standards in FEHB contracts 2005 for FFS carriers and 2008 for ER HMO Carriers.").[1]

OPM's standard contract with private carriers that provide health insurance to federal employees includes various requirements that apply when the carrier utilizes a PBM. See Federal Employees Health Benefits Program Standard Contract for Experience-Rated Health Maintenance Organization Carriers (2019) ("Standard Contract") at I-17, § 1.28 ("The Carrier will ensure and report that the following standards are included in new, renewing or amended contracts with vendors providing a retail pharmacy network and/or a mail order pharmacy and/or a specialty pharmacy to Enrollees and family members (hereafter 'PBM') effective on or after January 1, 2011.").[2] For example,

> [t]he PBM agrees to provide pass-through transparent pricing based on the PBM's cost for drugs (as described below) in which the Carrier receives the value of the PBM's negotiated discounts, **rebates**, credits or other financial benefits.

---

[1] Letter Number 2024-05 is available at https://www.opm.gov/healthcare-insurance/carriers/fehb/2024/2024-05.pdf, and Letter Number 2024-02 is available at https://www.opm.gov/healthcare-insurance/carriers/fehb/2024/2024-02.pdf.

[2] The Standard Contract is available at https://www.opm.gov/healthcare-insurance/carriers/fehb/experiencerated.doc.

(i)  The PBM shall charge the Carrier no more than the amount it pays the pharmacies in its retail network for brand and generic drugs plus a dispensing fee.

(ii) The PBM shall charge the Carrier the cost of drugs at mail order pharmacies based on the actual cost, plus a dispensing fee. Costs shall not be based on industry benchmarks; for example, Average Acquisition Cost (AAC) or Wholesale Acquisition Cost (WAC).

(iii) The PBM, or any other entity that negotiates and collects Manufacturer Payments allocable to the Carrier **agrees to credit to the Carrier either as a price reduction or by cash refund the value all Manufacturer Payments properly allocated to the Carrier.** Manufacturer Payments are any and all compensation, financial benefits, or remuneration the PBM receives from a pharmaceutical manufacturer, including but not limited to, discounts; credits; **rebates**, regardless of how categorized; market share incentives, chargebacks, commissions, and administrative or management fees. Manufacturer payments also include any fees received for sales of utilization data to a pharmaceutical manufacturer.

Id. at I-18, § 1.28(a)(1) (emphases added). The formularies used by a PBM are also subject to OPM reporting requirements. These include quarterly and annual Manufacturer Payment Reports that the PBM must submit to the carrier. See id. at I-18, § 1.28(a)(5). The Manufacturer Payment Reports must include the following information,

in the aggregate for the 25 brand name drugs that represent the greatest cost to the Carrier or such number of brand name drugs that together

17

represent 75 percent of the total cost to the Carrier, whichever is the greater number:

(i)  the dollar amount of Total Product Revenue for the reporting period, with respect to the PBM's entire client base. Total Product Revenue is the PBM's net revenue which consists of sales of prescription drugs to clients, either through retail networks or PBM-owned or controlled mail order pharmacies. Net revenue is recognized at the prescription price negotiated with clients and associated administrative fees;

(ii) the dollar amount of total drug expenditures for the Plan;

(iii) the dollar amount of all Manufacturer Payments earned by the PBM for the reporting period;

(iv) the Manufacturer Payments that have been (1) earned but not billed (2) billed and (3) paid to the PBM based on the drugs dispensed to the Plan members during the past year.

(v)  **the percentage of all Manufacturer Payments earned by the PBM for the reporting period that were Manufacturer Formulary Payments**, which are payments the PBM receives from a manufacturer in return for formulary placement and/or access, or payments that are characterized as "formulary" or "base" rebates or payments pursuant to the PBM's agreements with pharmaceutical manufacturers;

(vi) the percentage of all Manufacturer Payments received by the PBM during the reporting period that were Manufacturer Additional Payments, which are all Manufacturer Payments other than Manufacturer Formulary Payments.

Id. at I-18 to I-19, § 1.28(a)(5). OPM also imposes disclosure requirements on a PBM regarding its formularies.

> The Carrier will require that its PBM contractors:
>
> > (i)  Provide information to physicians, pharmacists, other health care professionals, consumers, and payers about the factors that affect formulary system decisions, including: cost containment measures; the procedures for obtaining non-formulary drugs; and the importance of formulary compliance to improving quality of care and restraining health care costs;
> >
> > (ii) Provide consumer education that explains how formulary decisions are made and the roles and responsibilities of the consumer; and
> >
> > (iii) Disclose the existence of formularies and have copies of the current formulary readily available and publicly accessible.

Id. at I-19, § 1.28(a)(8).

The Standard Contract provides that "OPM reserves the right to review and receive any information and/or documents the Carrier receives from the PBM, including a copy of its contract with the PBM." Id. at I-19, § 1.28(a)(7). The carrier is subject to audit by the OPM Office of Inspector General ("OPM OIG"), and, as part of the audit, OPM OIG can request, and the PBM must provide,

> all PBM records including, but not limited to:
>
> > (i)  All PBM contracts with Participating Pharmacies;

19

> (ii) All PBM contracts with Pharmaceutical Manufacturers;
>
> (iii) All PBM contracts with third parties purchasing or using claims data;
>
> (iv) All PBM transmittals in connection with sales of claims data to third parties; and
>
> (v)  All PBM Maximum Allowable Cost (MAC) price lists.

Id. at I-19, § 1.28(a)(9). Caremark represents that the contract provisions also allow OPM OIG to audit the PBM, and OPM OIG "has exercised its authority to audit Caremark's performance of PBM services on behalf of FEHBA clients, including auditing Caremark's practices regarding Manufacturer Payments." [Suppl. Notice of Removal at ¶ 12.]

Further, Caremark represents:

> 13. Rebate agreements between PBMs and manufacturers ("Rebate Agreements") are structured to cover a range of different clients and different formulary possibilities, including standard and custom formularies. For insulin, Caremark does not negotiate a separate contract for each of its clients with each manufacturer. To the contrary, for most of the period referenced in the [Amended Complaint], the same manufacturer-PBM contracts that governed rebates paid by manufacturers in connection with FEHBA plans also governed rebates paid in connection with non-FEHBA plans.
>
> 14. Caremark's FEHBA clients expect and desire that Caremark can and will obtain competitive rebates to offset the costs of pharmaceutical drugs. Such FEHBA clients would not contract with a PBM that was unable or unwilling to obtain discounts in the form of Manufacturer Payments, like rebates.

20

> 15.  The rebates that Caremark passes
> through to FEHBA clients ultimately reduce the
> cost of federal employee healthcare incurred by
> the government and/or employees.

[Id. at pgs. 7-8.]

In light of the foregoing, this Court finds that
Caremark's actions at issue in this case regarding its formulary
and rebate practices were "'actions under' a federal officer,"
*i.e.* OPM. See Goncalves, 865 F.3d at 1244.

### 2.  **Express Scripts**

Unlike Caremark, Express Scripts has a contract with
the DoD. See generally Heihre Removal Decl., Exh. B (redacted
version of the TRICARE Contract). Express Scripts argues: "The
DoD is required by law to engage companies like Express Scripts
for the provision of healthcare services to TRICARE members.
Congress also has required the Secretary of Defense to establish
an 'effective, efficient, integrated pharmacy benefits program'
for TRICARE." [Notice of Removal at ¶ 24 (citing 10 U.S.C.
§ 1073a) (quoting 10 U.S.C. § 1074g).] Express Scripts contends
it assists the DoD with, or helps the DoD carry out, these
duties by providing PBM services and administering DoD's mail-
order pharmacy program under the TRICARE Contract, including the
Statement of Work within the TRICARE Contract. See id. at ¶¶ 23-
26. Section 1074g requires that the pharmacy benefits program
provided by the DoD

21

include a **uniform formulary** of pharmaceutical
agents, which shall assure the availability of
pharmaceutical agents in the complete range of
therapeutic classes. The selection for inclusion
on the uniform formulary of particular
pharmaceutical agents in each therapeutic class
shall be based on the relative clinical and cost
effectiveness of the agents in such class. With
respect to members of the uniformed services,
such uniform formulary shall include
pharmaceutical agents on the joint uniform
formulary established under section 715 of the
National Defense Authorization Act for Fiscal
Year 2016.

10 U.S.C. § 1074g(a)(2)(A). Section 1074g further states:

(D) **The Secretary shall establish procedures for
the selection of particular pharmaceutical agents
for the uniform formulary.** Such procedures shall
be established so as best to accomplish, in the
judgment of the Secretary, the objectives set
forth in paragraph (1). Except as provided in
subparagraph (F), no pharmaceutical agent may be
excluded from the uniform formulary except upon
the recommendation of the Pharmacy and
Therapeutics Committee.

(E) Pharmaceutical agents included on the
uniform formulary shall be available to eligible
covered beneficiaries through—

(i) facilities of the uniformed services,
consistent with the scope of health care
services offered in such facilities and
additional determinations by the Pharmacy
and Therapeutics Committee of the relative
clinical and cost effectiveness of the
agents;

(ii) retail pharmacies designated or
eligible under the TRICARE program or the
Civilian Health and Medical Program of the
Uniformed Services to provide pharmaceutical
agents to covered beneficiaries; or

22

                     (iii) the national mail-order pharmacy
                     program.

The Statement of Work in the TRICARE Contract states:

> **Features of the pharmacy benefits program include the use of the DoD Uniform Formulary**, a tiered cost sharing structure, and a preference for generic over branded products. **The DoD formulary is managed by the DoD Pharmacy and Therapeutics (P&T) Committee** and lists the pharmaceutical agents, by therapeutic classes, that are authorized as basic program benefits. Prescriptions for selected pharmaceutical agents may be subject to prior authorization or utilization review requirements to assure medical necessity, clinical appropriateness and/or cost-effectiveness. DoD has established tiered cost-sharing by which beneficiaries partially defray costs of administering the pharmacy benefits program. Cost-sharing amounts differ based on the classification of a pharmaceutical agent as generic, formulary, or non-formulary, in conjunction with the point of service from which the agent is acquired. . . .

Heihre Removal Decl., Exh. B at PageID.134, § C.1.4 (emphases added); see also 10 U.S.C. § 1074g(a)(6)(A) (table setting forth "the cost-sharing amounts under this subsection for eligible covered beneficiaries," for 2018 to 2027, for "retail generic" pharmaceutical agents, "retail formulary" pharmaceutical agents, "mail order generic" pharmaceutical agents, "mail order formulary" pharmaceutical agents, and "mail order non-formulary" pharmaceutical agents). Further, Express Scripts "perform[s] as a fiscal intermediary on behalf of DoD to pay for all authorized pharmaceuticals and supplies dispensed for eligible

beneficiaries at retail pharmacies." [Heihre Removal Decl.,
Exh. B at PageID.135, § C.1.6.]

The TRICARE Contract provides that: "Claims from
network pharmacies will be paid in accordance with the
agreements which exist between the Contractor and its network
pharmacies, e.g., WAC plus/minus price adjustment, plus
Dispensing Fee, minus the collected co-payment." [Id. at
PageID.209, § G.11.1.4.1.] Express Scripts also represents that,
under the TRICARE Contract, there are "incentives to Express
Scripts if it is able to negotiate, with members of its retail
pharmacy network . . . , certain percentage discounts off the
WAC of a particular drug." [Express Scripts Opp. at 12 (citing
Heihre Removal Decl., Exh. B. at PageID.217-19, § H.1).]

In light of the foregoing, this Court finds that
Express Scripts's actions at issue in this case regarding its
formulary practices and pricing based off of a pharmaceutical
product's WAC were "'actions under' a federal officer," *i.e.* the
DoD.

**B.   Causal Connection or Association/Connection**

In addition to the contractual provisions cited in the
"actions under" analysis, Caremark represents that it "conducts
rebate negotiations simultaneously on behalf of a large swath of
clients including FEHBA plans," and "none of the rebates that
Caremark negotiates for insulin are exclusive to FEHBA plans."

24

[Suppl. Notice of Removal at ¶ 4.] Caremark also represents that:

> Rebate agreements between PBMs and manufacturers ("Rebate Agreements") are structured to cover a range of different clients and different formulary possibilities, including standard and custom formularies. For insulin, Caremark does not negotiate a separate contract for each of its clients with each manufacturer. To the contrary, for most of the period referenced in the FAC, the same manufacturer-PBM contracts that governed rebates paid by manufacturers in connection with FEHBA plans also governed rebates paid in connection with non-FEHBA plans.

[Id. at ¶ 13.] Among the State's allegations in this case are that PBMs artificially inflate the prices of prescription drugs by requiring drug manufacturers to pay rebates in exchange for preferred placement on the PBM's drug formulary. See, e.g., Amended Complaint at ¶¶ 7-13. Because Caremark negotiates rebates collectively and does not have separate contracts for FEHBA plans and non-FEHBA plans, and because the determination of drug prices is regulated by OPM through the OPM's contracts with the private carriers that contract with Caremark, the conduct that the State challenges in the instant case "occurred because of what [Caremark was] asked to do by the Government." See Isaacson, 517 F.3d at 137. Thus, Caremark has established

the causal-connection requirement in the causal nexus analysis.
See Goncalves, 865 F.3d at 1244.[3]

Express Scripts points out that the State seeks to
recover inflated out-of-pocket costs, including copayments, that
Hawai`i consumers incurred because of what the State alleges are
unlawful acts and practices by Express Scripts. [Notice of
Removal at ¶¶ 8-9.] However, some of the consumers in Hawai`i
are TRICARE beneficiaries who utilize Express Scripts's mail-
order pharmacy services. The copayments collected from those
Hawai`i consumers and the prices that the federal government
pays are dictated by federal law and the TRICARE Contract. [Id.
at ¶ 7.] Express Scripts asserts that, "[b]y seeking to recover
out-of-pocket costs any Hawai`i citizen has paid for certain
prescription drugs with purportedly inflated list prices, the
State necessarily seeks to recover the fixed copayments
contractually mandated by the federal government that Express
Scripts must ensure TRICARE beneficiaries pay for prescription
drugs." [Id. at ¶ 10.] As to the TRICARE beneficiaries in
Hawai`i who utilize Express Scripts's mail-order pharmacy
services, Express Scripts has established that the conduct the
State challenges in the instant case occurred because of what it

---

[3] In the alternative, this Court concludes that Caremark has
established the broader connection to or association with
requirement of the causal nexus analysis. See DeFiore, 85 F.4th
at 557 n.6.

26

was required to do under the TRICARE Contract and the applicable federal statutes. Thus, Express Scripts has established the causal-connection requirement in the causal nexus analysis.[4]

The State, however, argues its disclaimer in paragraph 22 of the Amended Complaint negates any causal connection or any connection to, or association with, acts under color of a federal office. This Court recognizes that a plaintiff may expressly waive claims that would give rise to potential federal defenses, such as the federal officer removal statute. See, e.g. Marcher, 2022 WL 562268, at *2 ("many courts in the Ninth Circuit have recognized that when the federal officer removal statute is at issue, a plaintiff may expressly waive claims that would give rise to potential federal defenses" (citing Fisher v. Asbestos Corp., 2014 WL 3752020 (C.D. Cal. July 30, 2014); Lockwood v. Crane Corp., 2012 WL 1425157 (C.D. Cal. Apr. 25, 2012)). As one district court has stated:

> Courts have frequently analyzed purported waivers in § 1442 removal cases, with the waivers generally falling into one of four categories:
>
> (1) Express claim waivers: the waiver clearly carves out certain factual bases, whether by time span or location, such that any alleged injury could not have happened under the direction of a federal officer. E.g., Fisher, 2014 WL 3752020, at *4.

---

[4] In the alternative, this Court concludes that Express Scripts has established the broader connection to or association with requirement of the causal nexus analysis.

27

(2) Ambiguous waivers: the waiver was
insufficiently comprehensive or subject
to conflicting interpretations in light
of other allegations, leaving some
claims that gave rise to a government
contractor defense. E.g., Despres v.
Ampco-Pittsburgh Corp., 577 F. Supp. 2d
604, 608 (D. Conn. 2008) ("Plaintiffs
in this case have not excluded from
their claims against [defendant] all
instances of asbestos exposure as a
result of [defendant's] work on behalf
of the Navy. Yet, Plaintiffs maintain
that they have waived their federal
claims. Plaintiffs cannot have it both
ways.")

(3) Overbroad waivers: the waiver attempted
to carve out factual bases giving rise
to a federal defense, but the complaint
contained allegations based solely on
facts giving rise to a federal defense.
E.g., In re Asbestos Products Liab.
Litig. (No. VI), 770 F. Supp. 2d 736,
741-42 (E.D. Pa. 2011) ("While
Plaintiffs purport to exclude any
claims against Defendant 'caused by the
acts or omissions of defendants
committed at the specific and proven
direction of an officer of the United
States government acting in his
official capacity,' the only claims
alleged against Defendant arises from
exposure on U.S. Naval ships at U.S.
Naval shipyards.")

(4) Jurisdictional waivers: the waiver was
designed to circumvent § 1442 through
"artful pleading" on technicalities
rather than to disclaim factual
allegations giving rise to a federal
defense. E.g., McMann v. Air & Liquid
Sys. Corp., No. 2:14-cv-281, 2014 WL
1794694 (W.D. Wash. May 6, 2014) (in
which plaintiffs filed a "disclaimer of
any claims subject to a government

> contractor defense under Boyle," and
> the court found the disclaimer
> ineffective).

> Ambiguous, overbroad, and jurisdictional waivers
> are routinely and uniformly found insufficient to
> support remand, while express claim waivers have
> almost always been found sufficient to eliminate
> the factual basis of a federal defense so that
> remand is appropriate.

O'Shea v. Asbestos Corp., Case No. 3:19-cv-127, 2019 WL
12345572, at *7 (D.N.D. Dec. 13, 2019) (alterations in O'Shea).[5]

In the instant case, to plead an effective waiver, the
State was required to expressly carve out certain factual bases,
whether by time span or location, such that any alleged injury
caused by Caremark could not have happened under OPM's
direction, and any alleged injury caused by Express Scripts
could not have happened under the DoD's direction. See id.
(citing Fisher, 2014 WL 3752020, at *4). The type of language
necessary to assert a valid waiver is illustrated in Fisher,
2014 WL 3752020. In that case, the complaint pled "distinct
allegations of asbestos exposure at government and at civilian
work sites," id. at *4, but the plaintiff's post-removal
disclaimer expressly stated he did not allege he "was exposed to
asbestos from CRANE CO. products on U.S. Naval vessels or at
U.S. government jobsites" and expressly "waive[d] any claims

---

[5] The magistrate judge's report and recommendation was
adopted by the district judge. 2020 WL 9848714 (Jan. 8, 2020).

against defendant CRANE CO. relating to or arising out of plaintiff's asbestos exposure at military and federal government jobsites or from U.S. military vessels or equipment," id. at *2 (emphases in Fisher) (citations and quotation marks omitted). Fisher's disclaimer was a valid, express claim waiver. The district court therefore rejected Crane's argument that federal jurisdiction existed based on Crane's government contractor defense and granted the plaintiff's motion for remand. Id. at *1, 6-7.

In the instant case, the State attempts to disclaim any "relief relating to any federal program (e.g., Medicaid, Medicare, TRICARE, FEHBA) or any contract related to a federal program." [Amended Complaint at ¶ 22.] However, because Caremark negotiates rebates for multiple clients collectively and does negotiate rebates that are exclusively for FEHBA-carrier clients, [Suppl. Notice of Removal at ¶ 4,] if Caremark did violate Hawai`i Revised Statutes Chapter 480 in its rebate negotiations, the violation may have happened under OPM's direction. Thus, as to the State's claims against Caremark, paragraph 22 of the Amended Complaint fails to assert an express claim waiver, and the State has failed to negate the causal nexus that Caremark has established.

In contrast to Caremark's causal nexus argument, which focuses on Caremark's conduct while acting under OPM, Express

Scripts's causal nexus argument focuses on the alleged injuries asserted by the State. See Notice of Removal at ¶¶ 8-10; Express Scripts Opp. at 11 (emphasizing that the drug manufacturer determines a drug's WAC and that the WAC is the same for all purchasers and arguing that "[p]enalizing Express Scripts for manufacturer increases in WAC of insulin means Express Scripts would be penalized for work it performs under TRICARE."). Because the State has confirmed that it does not seek relief related to any federal program nor relief related to any contract related to a federal program, even if the State ultimately prevails on its claims, there will be no award against Express Scripts that is based upon services Express Scripts provided under the TRICARE Contract. Thus, there will be no penalty against Express Scripts for its actions connected to or associated with acts under the DoD. As to its claims against Express Scripts, paragraph 22 of the Amended Complaint constitutes an express claim waiver that negates the causal nexus that Express Scripts has established.

Because one of the requirements for federal officer removal is not met, Express Scripts's removal of this action was improper. However, remand of this action is not necessary if Caremark's removal was proper. See Sroka v. Union Carbide Corp., Civil No. WDQ-13-3281, 2015 WL 794942, at *3 n.13 (D. Md. Feb. 24, 2015) ("Removal under the federal officer removal

statute is proper when one defendant meets the statute's requirements." (citation omitted)); <u>see also</u> <u>Gehant v. Air & Liquid Sys., Corp.</u>, CIVIL ACTION NO. 19-732-SDD-EWD, 2021 WL 4317284, at *3 (M.D. La. Aug. 31, 2021) (noting that, "[a]t the time of removal, and in light of the liberal interpretation given to § 1442, federal officer removal jurisdiction was sufficiently pleaded as to at least one defendant").[6]

## III. <u>Colorable Defense</u>

The Ninth Circuit has stated:

> The purpose of th[e colorable defenses] requirement is to supply a federal element under which the defense to the action arises. <u>Mesa [v. California]</u>, 489 U.S. [121,] 136, 109 S. Ct. 959 [(1989)]. Thus, "the federal-question element is met if the defense depends on federal law." <u>Jefferson County</u>, 527 U.S. at 431, 119 S. Ct. 2069. In determining removal jurisdiction under § 1442(a)(1), the scope of the court's inquiry is only whether the defendant advanced a colorable federal defense, "not whether [the] defense will be successful." <u>Magnin v. Teledyne Cont'l Motors</u>, 91 F.3d 1424, 1429 (11th Cir. 1996) (citing <u>Mesa</u>, 489 U.S. at 133, 109 S. Ct. 959). Defendants "need not win [their] case" before removal. <u>Willingham</u>, 395 U.S. at 406-07, 89 S. Ct. 1813. And a removing defendant need not have a colorable federal defense for every claim; one colorable federal defense against one asserted claim is enough. <u>Mesa</u>, 489 U.S. at 129, 109 S. Ct. 959.

---

[6] The magistrate judge's Report and Recommendation in <u>Gehant</u> was adopted by the district judge. 2021 WL 4314580 (Sept. 22, 2021).

DeFiore, 85 F.4th at 558 (some alterations in DeFiore). The relevant question is "whether th[e] defense [i]s 'immaterial and made solely for the purpose of obtaining jurisdiction or . . . wholly insubstantial and frivolous.' Bell [v. Hood], 327 U.S. [678,] 682–83, 66 S. Ct. 773 [(1946)]. Any federal defense that clears the low bar of Bell is colorable." DeFiore, 85 F.4th at 560.

Caremark argues it has a colorable express preemption defense. [Caremark Opp. at 13-14.] This Court agrees. Under the FEHBA, "[t]he terms of any contract under [the FEHBA] which relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans." 5 U.S.C. § 8902(m)(1). In Goncalves, the Ninth Circuit held that the removing parties had a colorable defense based on Section 8902(m)(1). 865 F.3d at 1249. In so holding, the Ninth Circuit relied on the United States Supreme Court's holding in Coventry Health Care of Missouri, Inc. v. Nevils, 581 U.S. 87, 137 S. Ct. 1190 (2017), that

> § 8902(m)(1) preempts state anti-subrogration laws by virtue of the fact that the "carrier's very provision of benefits triggers the right to payment," and all that is required for preemption is for the action to "relate to" that right to repayment, which is met in the subrogation-claim context. [Nevils, 137 S. Ct.] at 1197–98. In

> light of <u>Nevils</u>, we have little trouble
> concluding that the [removing parties'] assertion
> that § 8902(m)(1) preempts any state law
> supporting Goncalves's motion to expunge the lien
> is a colorable federal defense.

<u>Goncalves</u>, 865 F.3d at 1249.

Caremark is not a health insurance carrier like the removing parties in <u>Goncalves</u> were, but the analysis of the "relate to" language in Section 8902(m)(1) is instructive here. Because Caremark alleges it is "contractually require[d] . . . to pass all rebates they receive onto their FEHBA carrier clients," [Suppl. Notice of Removal at ¶ 3,] the State's claims challenging Caremark's rebate practices arguably relate to the FEHBA carrier clients' right to repayment for prescription drug benefits that they provided to their insureds. Further, Caremark's formulary practices that are at issue in this case arguably relate to the coverage or benefits that the FEHBA carrier clients provide to their insureds. <u>See</u> <u>id.</u> at ¶ 6 ("PBMs develop lists of drugs called 'formularies,' which health-plan clients can adopt to determine whether and to what extent those clients cover the cost of certain medications for their members. Although PBMs develop formulary products they offer to clients, their clients decide whether to accept, reject, or customize an offered formulary and set the coverage that applies to their members." (citations omitted)). This Court therefore concludes that Caremark has a colorable defense that the FEHBA expressly

34

preempts the Hawai`i Revised Statutes Chapter 480 claims that
the State brings in this case.[7]

IV. **Ruling**

        Because Caremark has established all of the federal
officer removal requirements, its Supplemental Notice of Removal
properly removed this action based on the federal officer
removal statute. The State's Motion is therefore denied. This
Court, however, notes that the analysis in the instant Order is
based upon the existing record. If it later becomes evident that
the relevant facts developed in the litigation do not support
jurisdiction, then dismissal and remand may be appropriate based
on lack of subject matter jurisdiction. See Fed. R. Civ.
P. 12(h)(3) ("If the court determines at any time that it lacks
subject matter jurisdiction, the court must dismiss the
action."); 28 U.S.C. § 1447(c) ("If at any time before final
judgment it appears that the district court lacks subject matter
jurisdiction, the case shall be remanded."); see also Fisher,
2014 WL 3752020, at *5 ("When federal question jurisdiction is
the only basis for a district court's authority to adjudicate,
post-removal developments may cause remand not only to be

---

    [7] Because this Court concludes Caremark has a colorable
express preemption defense, it is not necessary to address
Caremark's alternative argument that it has a colorable obstacle
preemption defense. See Caremark Opp. at 15.

proper, but even to be required." (some citations omitted) (citing 28 U.S.C. § 1447(c)).

**CONCLUSION**

For the foregoing reasons, the State's Motion to Remand, filed November 29, 2023, is HEREBY DENIED.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, May 1, 2024.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**STATE OF HAWAI`I EX REL. ANNE E. LOPEZ, ATTORNEY GENERAL VS. CAREMARKPCS HEALTH, L.L.C., ET AL; CV 23-00464 LEK-RT; ORDER DENYING PLAINTIFF'S MOTION TO REMAND**